*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re L. HENRICH, Minor.

UNPUBLISHED
August 17, 2023

No. 364283
Kent Circuit Court
Family Division
LC No. 20-051629-NA

Before: YATES, P.J., and BORRELLO and PATEL, JJ.

PER CURIAM.

Respondent-father appeals of right the trial court order terminating respondent's parental rights to his minor child, LH, under MCL 712A.19b(3)(c)(*i*) (conditions that led to adjudication continue to exist) and (3)(j) (reasonable likelihood of harm). On appeal, respondent challenges the statutory grounds for termination, the trial court's alleged reliance on hearsay evidence admitted at the termination hearing, and the trial court's decision that termination was in LH's best interests. For the reasons set forth in this opinion, we vacate the termination of respondent's parental rights and remand for further proceedings.

## I. BACKGROUND

Petitioner, the Department of Health and Human Services (DHHS), alleged that, on an evening in August 2020, a neighbor reported that LH came to her house and said that respondent's live-in girlfriend locked LH out of the house. The neighbor said that respondent came to her house after he got home from work; he was "very upset and yelling and took [LH] home." LH returned to the neighbor's house the following day with purple, blue, and red bruises on his right leg. LH said that the bruises were from respondent hitting him. The petition alleged that respondent's live-in girlfriend admitted that she locked LH out of the house for about three hours, that respondent spanked LH and hit him on the leg, and that LH was fighting and trying to get away from respondent. Respondent said that he spanked LH about five times with his open hand, but he denied causing the bruising and said that he did not know how the injuries occurred. The petition also alleged that respondent told a detective that "it is a privilege for [LH] to be allowed inside the residence, to have lights, food, etc., and if [LH] is not going to behave, he will lose those privileges." According to petitioner, respondent did not follow through on his agreement to take LH to the Center for Child Protection (CCP) for a medical evaluation, nor did he cooperate with

-1-

Children's Protective Services (CPS) in its investigation. Respondent also refused behavioral support and service referrals. In addition, respondent's physical abuse of LH resulted in a charge of fourth-degree child abuse.[1] On the basis of these allegations, petitioner asked the trial court to take jurisdiction over LH.[2]

At the preliminary hearing, the investigating CPS worker recommended allowing LH to continue to live with respondent because LH and respondent had a very strong bond and the bruising appeared to result from an isolated incident. She believed that respondent could benefit from services to address issues that he was having dealing with LH's behavioral problems and emotional regulation.[3] Respondent did not have a criminal history of violence, he had arranged for an Individualized Education Program (IEP) for LH, and was in regular contact with LH's school. The CPS worker believed that it would be more traumatic to remove LH from the home than to leave him there. She recommended an immediate home visit, a family team meeting, and a referral to Families First. The lawyer-guardian ad litem (LGAL) and attorneys for both parents agreed with the recommendation.

When the preliminary hearing resumed, the CPS worker testified that she visited respondent's home and found it generally appropriate. Respondent was willing to participate in Families First and was "very open" to receiving services for LH. Although prior investigations had included allegations of substance abuse, the CPS worker stated that the allegations had never been substantiated. She again recommended that LH be allowed to remain with respondent and that respondent be provided the necessary services. The LGAL and respondent agreed with petitioner's recommendation. Mother's attorney argued that LH should be placed either with mother or with LH's maternal grandfather.

Following the preliminary hearing, the referee recommended that the petition be authorized, that LH be taken into protective custody, that LH be placed with petitioner for care and supervision, that petitioner be granted discretion to allow respondent supervised or unsupervised parenting time, and that LH be placed with his maternal grandfather if appropriate. The trial court adopted the referee's recommendations and LH was placed with his maternal grandfather.

A combined adjudication and initial disposition review hearing was held before a circuit court referee approximately two months later. At the hearing, respondent admitted that he had been charged with fourth-degree child abuse and that he had refused to meet with CPS. Respondent pleaded no contest to allegations that LH said respondent's live-in girlfriend had

---

[1] Respondent pleaded no contest to the charge and was given a probationary sentence.

[2] The petition was filed against respondent and LH's mother. The supplemental petition was also filed against mother and respondent, and it was anticipated that the termination hearing would determine whether both parents' rights should be terminated. However, because mother was not properly notified of the date of the termination hearing, mother's hearing was rescheduled.

[3] A trauma assessment diagnosed LH with ADHD, intellectual disability, posttraumatic stress disorder, and intermittent explosive disorder. When LH became "escalated" at school, he could assault people, throw furniture, and pull things off of walls.

locked him out of the house, that LH was observed with significant bruising on the outside of his right thigh, that he spanked LH about five times with an open hand, and that he "hit LH with a belt on his right leg and buttocks, causing injuries." Finally, respondent pleaded no contest to allegations that he told a detective that it was a privilege for LH to be allowed inside the house and to have food and lights and that LH would lose these privileges if he did not behave. On the basis of respondent's admissions and no-contest pleas, the referee found statutory grounds to exercise jurisdiction under MCL 712A.2(b)(1) (lack of proper custody) and (2) (unfit home environment). He recommended that petitioner make reasonable efforts to reunify respondent with LH, that LH be placed with petitioner for care, that LH remain placed with his maternal grandfather, and that parenting time remain supervised. The trial court adopted the referee's recommendations.

At the dispositional phase of the hearing, the foster-care caseworker testified, in relevant part, that respondent's needs had been identified as parenting skills, therapy, and emotional support. The agency had made referrals to address these issues. Respondent had also been referred for random drug screens on the basis of his indication that he had used drugs in the past. According to the caseworker, respondent allegedly refused to take a drug screen until he knew that it would be clean. The caseworker admitted that respondent did not expressly state that he was using drugs, nor did he indicate what substances a drug screen might detect. The agency informed respondent that the failure to take screens or to show up for a random screening appointment would be considered a positive drug screen. The caseworker also testified that LH was excited to see respondent during supervised parenting time, and respondent generally engaged LH appropriately. She acknowledged that LH had a strong bond with respondent and that respondent "adore[d] and love[d]" LH. The caseworker also testified that respondent's live-in girlfriend was willing to be part of respondent's treatment plan, as she would be LH's secondary caregiver if LH was returned to respondent. The caseworker recommended continuation of the current arrangements regarding LH's placement, respondent's services, and parenting time.

The referee found that return of LH to respondent's home would not be appropriate at that time and reasonable efforts at reunification were to be continued. Regarding drug screens, the referee indicated that respondent should be drug screened to provide a baseline so that the trial court had an idea if it needed to order additional services. The trial court adopted the referee's recommendations and entered an initial dispositional order that, among other things, required respondent to comply with, and to benefit from, the case service plan.

Regular dispositional review hearings were held over the next 15 months. Respondent completed an online Trauma Informed Parenting class and, after a slow start, he completed a Foster-care Supportive Visitation program. He submitted to a substance-abuse assessment[4] and a psychological evaluation, and attended nearly every parenting time, at which he generally acted appropriately. But he consistently avoided taking drug screens. Respondent maintained that he lived a sober life, that he had not consumed alcohol in over 10 years, and that he had no drug history or drug arrests.

---

[4] Although respondent's substance-abuse assessment primarily involved self-reporting, it did not reveal any diagnoses.

At a dispositional review hearing in March 2021, respondent was asked why he did not prove all that with a drug screen. Respondent replied that he had "proved enough" and that he had "gotten nothing in return." The trial court told respondent that, although respondent self-reported that he lived a sober life, the court had no way of knowing that without a drug test taken at the agency and thus respondent had to comply with the agency's substance-abuse testing regime. The trial court delivered similar messages at every dispositional review hearing thereafter. The trial court told respondent at the May 2021 dispositional review hearing that it would discontinue testing if he submitted to drug testing for 90 days and the tests came back clean. But respondent failed to comply. The court told respondent at the November 2021 dispositional review hearing that it needed 100% compliance with screens and 100% negative results over the next six months. But respondent continued to resist doing drug screens. Often, respondent did not refuse outright to take a drug screen; he would agree to complete a drug screen at some other time, but then fail to follow through. At the February 2022 dispositional review hearing, the trial court made clear that drug screening was not negotiable. The trial court reiterated its position at the June 2022 review hearing. The trial court also authorized respondent to take a hair follicle test.

Respondent was also resistant to providing the trial court with information about his progress in domestic-violence counseling. Even before the initial disposition, the agency referred respondent to the YWCA for counseling for domestic violence. The case was closed after respondent failed to attend. After the agency rereferred respondent, he completed an intake appointment and was on a wait list. Later, however, the YWCA closed respondent's case because he was aggressive and threatening and the YWCA did not think that respondent would benefit from its services. Consequently, the agency referred respondent to the Men's Resource Center for therapy. The trial court told respondent at the May 2021 dispositional review hearing that he needed to attend, and benefit from, the domestic-violence classes at the Men's Resource Center. The court observed that this case arose from what was overly aggressive discipline at best, or criminal child abuse at worst, either of which the trial court viewed as domestic violence.

The foster-care caseworker reported at the November 2021 dispositional review hearing that respondent was attending therapy every other week at the Men's Resource Center, but she had been unable to obtain information about his progress. Respondent signed a release that only allowed his therapist to report respondent's attendance; it did not allow the therapist to identify respondent's therapy goals or his progress toward reaching those goals. Respondent told agency personnel that counseling involved a matter of privacy under the Health Insurance Portability and Accountability Act of 1996,[5] and that he was not going to release more than his attendance dates. The trial court directed respondent to release the content of his counseling records. Respondent's caseworker also tried in vain to obtain a release for respondent's probation officer, as well as completed paperwork from respondent's live-in girlfriend. The latter would allow the agency to provide respondent's live-in girlfriend with any services that she might need and to do the background check that would allow her to have parenting time with LH.

Despite respondent's resistance to disclosing information or participating in drug testing, it was reported that respondent's attendance and participation at parenting time was very consistent

---

[5] HIPAA is codified at 29 USC 1181 *et seq.*, 42 USC 300gg, and 42 USC 1320d *et seq.*

and he completed a parenting class. At the November 2021 dispositional review hearing, the foster-care caseworker reported that respondent was doing well in Supportive Visitation; he was very engaged in conversations with the Supportive Visitation worker, and all parenting times went well. It was consistently reported that respondent was very affectionate with LH, there was a parent-child bond, and respondent wanted LH returned to him.[6]

A permanency planning hearing was held in September 2022. Testifying from Kent County Correctional Facility, where he was incarcerated for violating his probation, respondent indicated that he would provide releases for the Men's Resource Center and for his probation officer. After closing arguments, the trial court observed that it was familiar with respondent's lack of follow-through on promised compliance. Implying that it was going to change the permanency goal to adoption, the court noted that respondent could "throw in the towel," or he could do 100% of what the court was asking for between his release from jail and the termination hearing. That meant submitting to a hair follicle test, completing 100% of the random drops as directed by the agency, releasing the contents of his therapy progress reports, providing a release for his probation officer, and resubmitting his live-in girlfriend's completed paperwork.[7] The trial court told respondent that if he turned things around in six weeks or two months, the trial court would be happy to cancel the termination hearing or to change it to a dispositional review hearing or a permanency planning hearing. The trial court urged respondent to "put the gas to the floor" after his release if he did not want his parental rights terminated.

In November 2022, petitioner filed a supplemental petition asking the trial court to terminate respondent's parental rights under MCL 712A.19b(3)(c)(i), (g) (parent fails to provide proper care and custody although financially able), and (j). Petitioner alleged that the barriers to reunification were respondent's lack of progress in the area of substance abuse, "child characteristics," parenting skills, communication/interpersonal skills, domestic relations, and "emotional stability behavior."[8]

One month later, the termination hearing was held. The caseworker supervisor affirmed that substance abuse remained a barrier to reunification. She testified about respondent's self-reported history with illegal substances and alcohol. She stated that whenever there is a concern about past drug use, the agency refers a respondent for drug screens to provide a baseline condition and to indicate if there are any needs in that area. In the more than two years since the case opened, respondent never completed a drug screen for the agency. She acknowledged that respondent took

---

[6] LH's behavioral problems made finding a stable placement difficult. Although he was initially placed with his maternal grandfather, in December 2021 the grandfather told petitioner that he could no longer meet LH's needs. As a result, LH was placed in a temporary placement program. From there, he went to a licensed foster home, where he stayed for eight days, and then he spent two nights at two different respite homes. In March 2022, he was placed with an experienced foster-care family, where he remained at the time of respondent's termination hearing.

[7] Respondent testified that he had submitted his live-in girlfriend's paperwork to three different persons and once by mail.

[8] At the time of adjudication, respondent's barriers included his parenting skills, domestic relations, anger management, and emotional stability.

a hair follicle test the day before the termination hearing, but maintained that a negative result would not change her assessment because respondent had resisted drug screens for more than two years and a hair follicle test for more than nine months.

The caseworker supervisor also testified that respondent refused to provide the agency and the trial court with information about his progress in group therapy. She concluded that, because the agency did not receive any substantive information from the Men's Resource Center, it could not determine whether respondent had made any progress in the areas of domestic violence and emotional stability. According to the caseworker supervisor, another barrier to reunification was "child characteristics." She testified that respondent consistently opposed giving LH psychotropic medication, despite its demonstrable benefit to LH, and he never acted on her suggestion to discuss his concerns with LH's prescribing physician. Although he arranged for LH to have an individualized educational program at school, respondent did not seek additional services to address LH's various diagnoses.

As to parenting skills, the caseworker supervisor testified that respondent had often been late to his parenting visits but had attended nearly all the visitations. She was not aware whether respondent had ever accepted responsibility for the allegations in the original petition or acknowledged that what happened to LH was inappropriate. She opined that progress was built on parents recognizing when their parenting style was inappropriate and harmful to their child. An ongoing concern throughout the case was respondent's lack of consistency in parenting and in recognizing what was appropriate for LH. Consistency was important to meeting LH's special needs, and respondent did not consistently apply the parenting skills taught in Supportive Visitation. The caseworker supervisor acknowledged that the parenting logs reflected that respondent was often appropriate and did some very good things. But she contended there was no clear pattern of change or increase in parenting insight.

On the basis of her factual testimony, the caseworker supervisor believed that terminating respondent's parental rights would be in LH's best interests. She acknowledged that a bond existed between respondent and LH but opined that it was weakening. The caseworker supervisor stated that hands-on parenting skills were important, and acknowledged that respondent was generally appropriate, sometimes even good. But she maintained that respondent's consistent follow-through with any service was also important for regaining custody of LH. She contended that respondent's disinterest in talking to LH's doctors and therapists about LH's needs were significant concerns in the assessment of respondent's ability to recognize and address LH's needs. She testified that LH needed a place where he could put down roots and establish a familial identity. She maintained that the advantages of the foster home weighed in favor of termination, despite the fact that it was not a relative foster-care home or a preadoptive home, because the foster parents had services in place and provided a high level of structure and routine for LH. The caseworker supervisor maintained that the longer a child was in care, the longer the agency needed to see consistent engagement by a parent to feel comfortable moving forward with reunification. Because LH had been in care for two years, the agency would need to see respondent genuinely engage in services for a year before it could recommend reunification. This additional time would not be in LH's best interests. Therefore, the length of time that LH had been in care weighed in favor of termination. The caseworker supervisor recommended that LH become a permanent ward of the court, committed to the Michigan Children's Institute, and that the trial court review the matter in 90 days.

After hearing testimony and oral arguments, the trial court found clear and convincing evidence of statutory grounds to terminate respondent's parental rights and that termination was in LH's best interests. First, the court found that substance abuse remained a barrier to reunification. The court indicated that it trusted respondent's assertion that he was drug-free, but maintained it had a legal duty to verify that was the case. The court acknowledged that respondent took a hair follicle test the day before the termination hearing, but stated it was "too little and too late." The trial court also found that "child characteristics" remained a significant barrier to reunification. Evidence showed that LH needed medication, additional services, and consistency and stability in his home environment, all things that the incident occasioning LH's removal showed were not happening. Further, respondent did not follow through to contact LH's doctors and discuss their findings and recommendations for LH.

In addition, the trial court found that parenting skills remained a barrier to reunification. The court noted that respondent never accepted responsibility for the incident that brought LH into care. The court understood that respondent would be reluctant to admit responsibility while the criminal case was ongoing. However, even after its resolution, respondent never accepted that the incident happened and that LH needed special treatment and attention. The court acknowledged that respondent was devoted to parenting time, that his interactions with LH were generally appropriate, and that he had completed Supportive Visitation and an online Trauma Informed Parenting class. Juxtaposed to that, however, was the fact that respondent did not successfully complete probation and that he chose to go to jail, regardless of the impact it would have on LH.

The trial court found that respondent had made significant progress in the area of communication and interpersonal skills when it came to interactions with agency personnel. But respondent's refusal to provide more than partial access to his counseling records left the court unable to determine whether respondent had addressed his anger issues and aggression.

On the basis of all these findings and considerations, the trial court concluded that clear and convincing evidence established statutory grounds for termination under MCL 712A.19b(3)(c)(*i*) and MCL 712A.19b(3)(j), and that termination of respondent's parental rights was in LH's best interests. The court entered an order terminating respondent's parental rights, placing LH in the permanent custody of the court, and committing him to the Michigan Children's Institute for adoptive planning. Respondent now appeals.

## II. STATUTORY GROUNDS

Respondent first argues that the trial court erred by finding clear and convincing evidence of statutory grounds to terminate respondent's parental rights because it placed excessive emphasis on substance abuse, when substance abuse was not an issue at the adjudication and the evidence did not support termination on any other statutory grounds. We agree.

## A. STANDARD OF REVIEW

We review a trial court's factual findings regarding statutory grounds for termination of parental rights and the decision to terminate parental rights for clear error. MCR 3.977(K); *In re White*, 303 Mich App 701, 709; 846 NW2d 61 (2014). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving

due regard to the trial court's special opportunity to observe the witnesses." *In re Sanborn*, 337 Mich App 252, 276; 976 NW2d 44 (2021) (cleaned up). "To be clearly erroneous, a decision must be more than maybe or probably wrong." *In re Ellis*, 294 Mich App 30, 33; 817 NW2d 111 (2011). "When applying the clear-error standard in parental termination cases, 'regard is to be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it.' " *In re Mota*, 334 Mich App 300, 320; 964 NW2d 881 (2020), quoting *In re Miller*, 433 Mich 331, 337; 445 NW2d 161 (1989); see also MCR 2.613(C).

## B. ANALYSIS

"In order to terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination in MCL 712A.19b(3) has been met." *In re VanDalen*, 293 Mich App 120, 139; 809 NW2d 412 (2011). If at least one statutory ground for termination is established, "we need not consider whether the other grounds cited by the trial court also supported the termination decision." *In re Foster*, 285 Mich App 630, 633; 776 NW2d 415 (2009).

In this case, the trial court found that clear and convincing evidence established grounds to terminate respondent's parental rights under MCL 712A.19b(3)(c)(*i*) and (3)(j). A trial court may terminate a respondent's parental rights under MCL 712A.19b(3)(c)(*i*) if "182 or more days have elapsed since the issuance of an initial dispositional order" and "[t]he conditions that led to the adjudication continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age." Termination of parental rights is proper under MCL 712A.19b(3)(c)(*i*) when "the totality of the evidence amply supports that [the respondent] ha[s] not accomplished any meaningful change in the conditions" that led to the adjudication, *In re Williams*, 286 Mich App 253, 272; 779 NW2d 286 (2009), "despite time to make changes and the opportunity to take advantage of a variety of services[,]" *White*, 303 Mich App at 710 (cleaned up). Termination under § 19b(3)(j) is appropriate when "[t]here is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if he or she is returned to the home of the parent."

In this case, it is undisputed that 182 or more days have elapsed since the initial dispositional order. At the time of adjudication, respondent's barriers included his parenting skills, domestic relations, anger management, and emotional stability. Respondent argues that the trial court gave dispositive weight to his refusal to submit to drug screens, even though substance abuse was not one of the conditions that led to adjudication. Petitioner concedes that substance abuse was not one of the grounds of adjudication and that the issue of substance abuse arose during the dispositional phase of the child protective proceedings. Because substance abuse was not one of the grounds for adjudication, it was not relevant to the determination whether clear and convincing evidence supported termination under MCL 712A.19b(3)(c)(*i*). Absent the court's findings about substance abuse, respondent contends that clear and convincing evidence did not support termination under MCL 712A.19b(3)(c)(*i*). We agree.

First, there was insufficient evidence that parenting skills remained a barrier to reunification. It is undisputed that respondent was devoted to parenting time, his interactions with LH were generally appropriate, he showed good parenting skills at times, he completed Supportive Visitation, and he completed an online Trauma Informed Parenting class. The trial court focused

on respondent's alleged failure to accept responsibility for the allegations in the petition and that LH needed special treatment and attention. The trial court clearly erred by finding that respondent failed to accept responsibility for the allegations in the petition. At the adjudication, respondent admitted that he had been charged with fourth-degree child abuse and pleaded no contest to allegations that LH said respondent's live-in girlfriend had locked him out of the house, that LH was observed with significant bruising on the outside of his right thigh, that he spanked LH about five times with an open hand, and that he "hit LH with a belt on his right leg and buttocks, causing injuries."[9] Respondent also pleaded no contest to allegations that he told a detective that it was a privilege for LH to be allowed inside the house and to have food and lights and that LH would lose these privileges if he did not behave. By pleading no contest, respondent essentially admitted the allegations in the petition. The following explanation by our Supreme Court of the effect of a no-contest plea in the criminal context applies with equal force to the child-protective proceedings context:

> No-contest pleas are essentially admissions of all the elements of the charged offense and are treated the same as guilty pleas for purposes of the case in which the no-contest plea is entered. Indeed, other than the means by which a court determines the accuracy of the plea under subrule (D)(2), MCR 6.302 recognizes no distinction between no-contest and guilty pleas for purposes of the plea hearing. Therefore, for purposes of this opinion, we discuss no-contest and guilty pleas synonymously. [*People v Cole*, 491 Mich 325, 332 n. 6; 817 NW2d 497 (2012) (citations omitted).]

Further, the evidence clearly reflects that respondent recognizes that LH needs special treatment and attention. Before CPS's involvement, respondent had arranged for an IEP for LH and was in regular contact with LH's school.

We also find that there was insufficient evidence that respondent failed to make progress in the areas of anger management and emotional stability. It is undisputed respondent attended group therapy every other week at the Men's Resource Center, but the trial court focused on respondent's refusal to consent to the release of his therapy session notes. While the contents of respondent's therapy progress reports would presumably provide information on respondent's progress towards his therapy goals, the evidence reflects that he made significant progress in the areas of anger management and emotional stability. The caseworker supervisor testified that, initially, respondent was antagonistic and verbally assaultive toward staff and confrontational. But the caseworker supervisor testified that respondent was cooperating and communicating well by June 2021, and he generally continued to communicate effectively. At the December 2022 termination hearing, the trial court found that respondent had made significant progress in the area of communication and interpersonal skills when it came to interactions with agency personnel.

And because child characteristics was not one of the grounds for adjudication, it was not relevant to the determination whether clear and convincing evidence supported termination under MCL 712A.19b(3)(c)(*i*). Accordingly, the trial court clearly erred by finding that clear and

---

[9] Respondent denied causing the bruising or knowing how LH obtained the bruises.

convincing evidence supported termination of respondent's parental rights under MCL 712A.19b(3)(c)(*i*).

We also find that the trial court clearly erred by finding that clear and convincing evidence supported termination under MCL 712A.19b(3)(c)(j). The trial court cited respondent's lack of acknowledgment of "what happened in the past," the absence of evidence indicating that respondent had benefited from participation in anger management treatment, and the lack of evidence that respondent understood LH's conditions and what they required. As already discussed, respondent acknowledged his actions and pleaded no contest to the factual allegations supporting the petition. Further, the caseworker supervisor and the court both recognized the significant improvement in respondent's communication and interpersonal skills, which reflects that respondent benefited from participation in anger management treatment. And, as discussed, the evidence clearly reflects that respondent recognizes that LH needs special treatment and attention. It is undisputed that respondent was devoted to parenting time, his interactions with LH were generally appropriate, he showed good parenting skills at times, he completed Supportive Visitation, and he completed an online Trauma Informed Parenting class. It is further undisputed that respondent was very affectionate with LH and that there was a parent-child bond. Accordingly, we find that there was insufficient evidence on which the trial court could find that there was a reasonable likelihood that the LH would be harmed if he is returned to respondent.

Finally, we note that the investigating CPS worker recommended at the October 2020 preliminary hearing that LH continue to live with respondent because LH and respondent had a very strong bond and the bruising appeared to result from an isolated incident. The CPS worker believed that it would be more traumatic to remove LH from the home than to leave him there. The LGAL and attorneys for both parents agreed with the recommendation. When the preliminary hearing resumed two weeks later, the CPS worker testified that she visited respondent's home and found it generally appropriate. She again recommended that LH be allowed to remain with respondent, and the LGAL agreed. Ultimately, the referee recommended that LH be placed with his maternal grandfather and the trial court adopted the recommendations. But, 16 months later, in December 2021, the maternal grandfather told petitioner that he could no longer meet LH's needs, and LH was placed in a temporary placement program. From there, LH was shuffled to several homes until he was eventually placed with an experienced foster-care family in March 2022. But that is not a preadoptive home, and LH will be institutionalized until he is adopted. Suffice it to say that we are left with a definite and firm conviction that the trial court clearly erred when it found that § 19b(3)(c)(*i*) and § 19b(3)(h) were proven by clear and convincing evidence. Therefore, we vacate the order terminating respondent's parental rights.

Vacated and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Stephen L. Borrello
/s/ Sima G. Patel